Case 14-5081, Validus Reinsurance, Ltd. v. United States of America. Ms. Del Sol for the appellant, Mr. Guerra for the appellee. Good morning. Good morning. May it please the Court. This case involves whether the excise tax in Tax Code Section 4371-74 on foreign insurance and reinsurance applies to retrocessions, which is reinsurance on reinsurance. I think when the statute is considered as a whole, particularly in light of its history, it's very clear that the district court erred in focusing in on a narrow phrase in the statute and disregarding the statute as a whole to conclude that retrocessions are not subject to the tax. When Congress first enacted the statute in 1942, it very clearly imposed the excise tax in language that would have reached retrocessions. It implied the tax that all policies of reinsurance issued by foreign reinsurers that were with respect to hazards, risks, losses, and liabilities that were covered by the direct or primary statutes described in the statute. And even Validus has conceded that its policies fall within this language, that they're relating to U.S. risks and would be with respect to U.S. risks. That's found in a summary judgment brief in Doc 22 of the record at pages 10 through 11, and also even in its brief to this Court at page 21. Let me ask you, as a tax attorney, are you familiar with the tax code in the sense of there often is repetitious language? There are incidents, I think, where Congress used it. I think, as with all statutes, there are incidents where there is repetitious language. Well, one of the arguments is that in subpart 3 there would be surplusage under the government. I don't think that's correct, Your Honor. I think if you look at the history of the statute, when Congress broke out the definitions into a separate section in 1954, it first of all specifically said it didn't mean to change the meaning of the statute. And I think that's reflected in both the Senate and House reports. And Congress made very clear that it was still intended to apply the tax to the scope of what it defined as policies of reinsurance. And I think the surplusage would exist under the district court's reading because the statute in 4371 in its open provision applies the tax to each policy of reinsurance. And then in 4372F, it defines the policy of reinsurance more broadly. And validus of the district court's analysis requires then reading Section 4371.3 as cutting back what would be taxed in what, as the American Bankers Claims, is the rate provision for the statute. It's saying, well, we're going to say we're going to tax each policy of reinsurance and define it broadly and then read 4371.3 as cutting that back. And I think that really doesn't make sense. It would make 4372F the surplusage. And I think it is a cardinal rule of construction not to read the statute to make any part surplusage. Well, that's what I'm getting at. It cuts both ways. Well, I think if you read 4371.3 with its most natural reading, it fits in with giving 4372F meaning and no part of the statute has to be rendered superfluous. What the district court did is it read this language covering any of the contracts taxable under Paragraph 1 and 2 as requiring a direct coverage or privity of contract between the reinsurer and the insurer. And nowhere did Congress use the word direct or require privity of contract. And I think when you look at it, as we set out in our brief, the normal reading of covering and the meaning in many of the cases involving insurance cases contemplates layers of coverage with each layer covering everything underneath. In their brief, Bautis suggests that this only applies to blankets and tablecloths, but I think blankets and tablecloths really give you a very apt analysis. If you lay one layer on top of the other, the thing on top covers everything underneath. And I think when Congress used the term coverage here, they meant the chain of coverage. And just to take an insurance of the risk, the coverage of the risk. And so every layer of reinsurer covers the risk underneath it. How do you respond to Validus, if I'm pronouncing it correctly, argument about compounding? Well, I think you mean the fact that the tax is compounded? Well, I think, Your Honor, what Congress intended to do with the statute as explained in the legislative history was to level the playing field between foreign reinsurance companies that don't pay income tax and U.S. income tax companies that do pay income tax on their taxes at a very high rate. I mean, the U.S. corporate income tax rate is one of the highest in the world. And it recognized that that created a competitive imbalance. And what it was trying to do was to create some sort of rough tax parity. And I think if you look at sort of the Treasury Department's studies and concluded that this actually does produce rough tax parity. I mean, if you look at the fact that if it was a U.S. contract, each insurer in the chain of reinsurance would pay income tax on the premiums. And granted, there might be deductions for purchase of reinsurance premiums and other business expenses, but ultimately, the last U.S. reinsurer would have no deduction for reinsurance premiums and would pay probably most of that 35 percent tax. On the other hand, if there are reinsurers, I think in that situation, Congress has imposed on each level of reinsurance a one percent tax. So you'd have to have many more levels of reinsurance than I think as a practical matter ever happened to approach what the income tax would be if you just look at the tax rates on its own. And I think when you look at the whole issues of, you know, how the deductions play in, what the Treasury has found is that this actually gives some sort of tax parity, and that was what Congress was aiming at. And I think, you know, in the U.S. context, each level is subject to a tax, and the excess tax simply does the same thing. And I think if you go back to the meaning of covering, if you just take an insurance example, if, for example, each reinsurer provided 100 percent coverage, ultimately, the person, the retrocessionaire at the end of the chain would be paying the full amount of the expense. And I think when somebody promises to pay somebody else and somebody pays somebody else and somebody at the end pays the whole thing, it's generally viewed as covering the cost, as a matter of ordinary usage. So the best rating of 4371.3 is the one the government is urging here that would comport with the rest of the statute, and it would mean none of the statute was meaningless, and it would all make sense with the history of the statute, and Congress's expressed intent not to change the meaning from the wording that originally existed, that I think pretty clearly would reach these retrocessions here. Ms. Tussall, in actual practice in this industry, is it the norm or even – is it the norm or anything close for the initial insurer to lay off the entire risk to a reinsurer? There are different types of reinsurance contracts. I would think that it would be more the norm that the initial insurer takes the first tranche, and if the losses exceed a certain level, they've laid that off. I think that probably is typical, Your Honor. Okay, let's stay with that. That's typical. Yeah, but I just – So in that case, the reinsurer is insuring against the risk that claims will rise above a certain level. For example, in some of the – Which is a different coverage than first-dollar insurance. Well, Your Honor, I think what's important here is that this statute was intended to – you know, it doesn't distinguish between types of reinsurance policies, and there can be all types. These are identification policies. I understand that, but the argument about coverage – is that it's tortoises all the way down, and you get to the same risk at the end of the day. They're all insuring against the hurricane in Florida. Right. But the alternative view of that is that Swiss Re, who's fourth in the chain, is insuring against a hurricane of such a magnitude that the losses for its original insurer exceed some dollar amount. Well, Your Honor, I think – Is that a totally ridiculous argument? I think that can be the case in some circumstances. In that case, there's an ambiguity in the statute. Well, Your Honor, I think you're still covering the risk, and I think the reasonable reading is that ultimately the risks are covered. If you look at the legislative history – Wait a minute. Everyone agrees, no question, their ultimate risk is a hurricane in Florida, in my example. Right. The question is whether the coverage is the same when, in fact, somebody down the line, the reinsurer, is covering only risks above a certain level. Well, Your Honor, the statute doesn't say it has to cover all the risks. It says it has to cover the contracts. Your argument was that it covered all the risks. Well, I was giving that as an example to make you understand that the person at the end of the line would be paying. But I think even if the person at the end of the line only paid part, they're still covering the contract and the underlying risks. In a sense, they're covering a piece of it if it rises to a certain level. Yes, and that would be within the meaning of covering if they're covering a piece. And I think that's the important thing here. And by viewing it as covering all or part of it – Well, it's just covering any of the contracts, right? But it's covering a portion of one of the contracts. Well, but I think it still falls within covering to cover a portion. And that's much more reconcilable with the rest of the statute when you look at the definition as being with respect to the risks. And by saying covering a portion is enough, it's consistent with the legislative intent. It's consistent with the only case on the issue, the Northumberland case, which did hold the tax applies to a retrocession between two foreign reinsurers. And it's consistent with the regulation, which Treasury regulation – Is that cognizable for us, those considerations, in asking the question whether the statute is at all ambiguous or is it a question of whether it's facially ambiguous? I'm sorry, I'm not sure I understand your question. If the statute's ambiguous, we get to the question of extraterritorial application. And I think of deference to the regulation as well. So all those things you say come into reading the initial – to the statute in answering the initial question, is it ambiguous? That is true. But I don't think you have to get to that because I think the statute on its face can only be reconciled if you give covering a meaning as covering the risks and covering any part of the ultimate financial responsibility. But I think if you do get to that point, that deference to the regulation would be appropriate because the regulation and the case law, the only case law that's been on the books since the 1970s, concluded looking at the legislative intent and the statute of a whole, that the proper construction of the statute was that retrocessions would be taxed. And that would be in the Northumberland opinion. And it looks at the issue – you know, it says basically, you know, that these arguments that pick out little pieces of 4371-3 are perhaps facially appealing, but when you look at the statute as a whole, that doesn't make sense when you put all the pieces together, particularly in light of the legislative history. That's very, very clear. And there's, you know – Well, aren't there reasons on the other side here, advanced by the other side, that suggest – that are at least – that are at least enough to be – to say that they have an argument? Let's talk about tax stamps, for instance. 1942, right? You have to buy stamps to pay the tax. Stamps are sold only at post offices. I think – You're a foreign reinsurer. Certainly businesses had agents. There was air mail. There were means of shipping things abroad at that time. And there's no indication in either the legislative history or the earlier case law that indicates that that was a concern. So I think this is something that something – now it's just come up with, which is a creative argument, but I don't think there's any foundation for it. In fact, in terms of what Congress was concerned about or what the earlier cases raised concerns about, and I think the fact that people could ship things by air mail really doesn't make that a real concern. And I think if the courts – So every foreign insurer would have to have an agent in the U.S. Well, I think most of them use brokers in the U.S. That's how they sell the insurance in the U.S. And certainly they could have – they don't have to have an agent to have somebody go pick up stamps for them and ship it to them. Well, that person would be called an agent. I guess – I don't know if you're using some technical means of agent, but you could just have a service do that, some sort of contractual service do that. Just call FedEx. Well, some – 1942. 1942 FedEx equivalent, I guess. But I think if the court should conclude it's ambiguous, I don't think that the deciding factor here is the presumption against extraterritorial allocation because this statute on its face is not like the statutes, for example, in Morrison, that were primarily domestic statute. This is a statute that's entirely designed to reach foreign reinsurers and to eliminate the unfair competitive advantage. Well, it can reach foreign insurers who are either in or have a direct connection to the U.S., which is consistent with the point you've just made, that it says foreign insurers. Right. It's all about foreign insurers. It doesn't necessarily mean that it meets – that it reaches foreign insurers who have nothing to do with the U.S. and whose policy relationship is with another foreign insurer. Well, Your Honor, it actually does reach foreign insurers that have no connection with a U.S. insurer. What do you mean due process? Contact. Well, I think the statute actually does apply if you have a foreign insurer and a foreign reinsurer, and I think that's very clear on the face of the statute, and I think also that the statute does generally – its whole purpose is to reach foreign insurers who are not doing business in the U.S., and it particularly carves out that line. So I think that makes it very clearly intended to reach a certain category of foreign insurers who are not actually here doing business. I see I've gone way over my time. I hope I can have a few minutes for rebuttal. So I would like you to explain something so I'm a little clearer about it. In your brief, you make the statement, and I just need to understand it, you say the intent of Congress would be thwarted if you exclude all retrocessions or it leaves room for foreign insurers and reinsurers to structure their transactions in a way to allow them to access the U.S. insurance market and yet avoid the tax imposed by 4371. Thank you for asking that question. I think it's a very good question, Your Honor. But basically what could happen if we didn't reach retrocessions here is that a foreign insurer would know that only the first level of insurance and the reinsurance would be taxed, and then it could set up a U.S. affiliate, you know, the foreign insurer who would otherwise, you know, not be doing business in the U.S. It could set up U.S. affiliates to sell. But wouldn't that affiliate be subject? Well, it would be subject to income tax in the U.S., and the reinsurer who was an affiliate would be subject to tax. But each of them would have really no other U.S. business and probably no other U.S. business expenses or very minimal ones. They could claim deductions for their reinsurance premiums that offset any U.S. income tax, and then ultimately the retrocessionaire would be able to ultimately cover everything when they would have covered it directly and they'd pay no tax. The deduction they're claiming is for the excise tax? For the income tax, for the U.S. income tax. What are they deducting? I'm sorry. If they're doing business in the U.S., the affiliates would be subject to U.S. income tax. And what is the deduction to which you're referring? Well, they would take a deduction for premiums that they paid out to the reinsurer. So when you pay insurance, you get a deduction for reinsurance premiums. And they could structure those so that the reinsurance premiums were enough to offset any U.S. income tax. And then the retrocessionaire. No, they have to offset all U.S. income. All U.S. income tax. No, they have to offset the income, not the income tax. Right. Well, I'm sorry, yes, you're right. They would offset the income so that ultimately they don't pay any U.S. income tax or it's very minimal. And then the retrocessionaire would pay no excise tax, so the transaction could be tax-free. And if you say, you know, it doesn't apply to any retrosections ever, it just gives them, you know, lets them know. You need one insurer, one foreign reinsurer, and then you can kick the money out of the country and not pay any tax. So where would I find this explained along the lines of what you just said? Is there any analysis or something I can read? I think the Northumberland decision is the best analysis of that. I'm sorry? I'm sorry, Your Honor. That's the name of the judge who wrote this. Oh, I'm sorry, Your Honor, I didn't understand what you said. So it's his analysis that is really the government's point in that statement I just read. I think that's really the point, that you'd have the same lack of leveling the playing field. I don't think he goes into as much detail as I do here, but I think his analysis is along those same lines. But I'm not sure that there's an authority. You know, there really only is the American bankers in the Northumberland case. There's not a lot of case law in this. But I do think. And there's not a lot of regulatory explanation either. Well, Treasury Regulation 46.4371-2C. Yeah. It's directly on point and governs this. And, you know, there were two other revenue rulings which are cited in our briefs that address it. But I think, you know, that regulation is part of a section of regulations that addresses it. So even though the government didn't raise the deference argument in the district court, your point is that even if it had, we would only see what we see now, namely the Treasury Regulation and the revenue rulings? That is correct, Your Honor. And I think, you know, obviously if this court were to, you know, a relative discretion since it wasn't raised below to decide whether to give that deference, but I would certainly urge the court to because I think this is a case where it's a purely legal issue. The regulation speaks for itself. And, of course, this case would be inconsistent with subsequent cases where the government raised the regulation. If the court should conclude, that makes the difference. All right. Thank you. Thank you. Any other questions? Thank you very much. Good morning. Good morning, Your Honor. May it please the Court, Joe Brewer for Validus Reinsurance. I would just ask the Court if I would be accorded additional time in light of the time that the appellant can serve. Sure. Thank you very much. Your Honor, Judge Ginsburg, you made the point and it's directly on point here. The statute doesn't say it imposes a tax on contracts, reinsurance policies that cover risks. It says policies of reinsurance that cover contracts taxable under paragraphs one and two. And covering a contract in the reinsurance context has a plain and unambiguous meaning. It means to provide identification for liabilities that arise under particular contracts. Congress didn't need to use the word direct or the word privity in order to convey that. That's the background common law rule well established in this area that would have been understood by the Congress. And so Congress would have had to countermand that and say we don't mean to incorporate those principles. Is there any evidence of this background common law rule? Yes, we have, Your Honor. We've cited the treatises, including one that was passed just or written just shortly after the statute was adopted. Not Mr. Strain, somebody else? Strain and Fear, I think, was the one that's more contemporaneous. And the two fundamental rules are reinsurance is a strictly indemnification contract and there's no privity with third parties. That's well established. That's been the law for decades. And in light of those rules, there is no coverage provided to a primary insurer by a retrocession. And if validus defaults on its obligations, the primary insurers, whose policies are taxable under paragraphs 1 and 2, have no recourse whatsoever against validus, excuse me, against their retrocessionaire. They have no rights. They derive no protection. And if validus pays its liabilities, then it is validus alone that has indemnified them. All right. So you're speaking as an expert in this area. But when Congress passed this statute, all right, it had a goal in mind of protecting American insurance companies. And just as I ask counsel for the government, everybody's telling us the statute is plain on its face, et cetera. But it's on the assumptions of a lot of practices and understandings that, except for these two district court opinions, really, you know, we don't know all of this. And I looked at Mr. Strain or Professor Strain, and he's talking, you know, in very plain terms about what is reinsurance, what is retrocession, that type of thing, not the type of comments that are being made here this morning. No, Your Honor, I'm relying on comments in his treatise and a few others. That are cited in your brief? They are, in fact. All right. What's the second treatise? There's a reference to Schwartz and Rosenhaus. I don't see. Oh, I'm sorry. We cite Strain right at the beginning of our brief for these fundamental principles. No, I am clear on that. All right. But I'm talking about you say Congress didn't have to put the word direct in because everybody understood. This is the nature of the beast. That flows from privity. That flows from the fundamental rule of privity, Your Honor, because there is no such thing as indirect coverage. I understand the privity point. But that means there's no indirect coverage. And I understand that, but I'm not clear why that means necessarily that Congress had in mind this excise tax would not reach these other. Well, I'll address that in pieces if I may, Your Honor. First of all, one case, it's not cited in our brief, but the Supreme Court decision in the I4I Microsoft case, the general rule is you must presume that Congress is aware of the common law principles in an area when it legislates. And so these principles have to have been understood by Congress unless Congress evidenced a contrary meaning. So the presumption. What is the common law principle you're relying on? There is no privity. No privity. No privity. So there's no indirect coverage protection. Your Honor, also on the, with respect to the intention. Can I just be clear? If I have a contract of insurance and the insurance company in turn is reinsured, and then the reinsurer gets reinsured. That's our retrocession. I don't have any claim against the ultimate reinsurer. Nor do you have any claim against the first reinsurer. But that's the privity we're talking about. That's not what we're talking about in this excise tax. No, we are, Your Honor. We are talking about what coverage means. And my retrocession can't cover either your insurance, homeowners insurance policy, or the prime, or Allstate for having written you that policy because there is no privity between you or Allstate and my retrocession there. And as a consequence of that rule, the retrocession cannot cover those contracts. They only cover the contract of Valis to Allstate. The government's argument is you're covering the risk. Right, and that's exactly why the government's argument is incorrect. The statute says covering contracts, not risks. Your Honor, there's been a lot of this. Well, the contract is a contract addressing risk. But there are different risks in each contract. Your contract with Allstate is my house may collapse, my roof may blow off. Allstate's contract with Valis is we may suffer losses in the United States from various events. Valis's risks are. Among them. Among them. Yes. But the contracts are distinct. Right. They don't just run all together, and the risks don't just flow back and forth as though there's no. I understand the flow back and forth, but I'm not understanding why the risk, the underlying risk isn't relevant. We can see that there's a relationship. All right. What we're saying is that's not good enough because Congress said covering any contracts, not covering any risks. And, Your Honor, if I may, about the 1942 legislation. First point is this Court said repeatedly you're not supposed to look to legislative history and prior legislative language in order to cloud the meaning of an otherwise unambiguous statute. Second, the government is just speculating about what the 1942 Act means. We didn't concede the scope of that statute. We were talking about the interplay of language in the current law and what that meant for the definition of reinsurance. We never said, of course, the 1942 Act reached anything. And they're just saying because there's a sentence in the House report that says we didn't mean to change anything, that means that the 1942 Act covered all wholly foreign retrocessions, and the statute still does today. And if I may, Your Honor. So the statement that this contract was covered under the 1942 Act, that is not something you acknowledged? No, Your Honor. Our point was, excuse me, our point was that in light of the Rossello Principle, that you have to give different language and different clauses different meaning, the definition of reinsurance in the current statute had to be understood broadly to encompass all reinsurance policies because of the narrower language covering any contracts in Paragraph 3. That language, that narrowing language, wasn't in the 1942 Act, so the rule that you have to give different clauses different meaning didn't apply to the 1942 Act. And there are two fundamental points to bear in mind about the 1942 Act. First of all, as Judge Ginsburg alluded to, it's unimaginable that the 42 of Congress thought, not just that they had the difficulty of buying stamps, but the United States could actually administer and enforce a tax on transactions between entirely foreign entities around the globe, which no one in the United States would even know about. But isn't this industry basically in London and Switzerland? It's no longer just in those places. But even so, Your Honor, no one, retrocessions, we point out, retrocessions are not even known necessarily to primary insurers, so they would not have any idea that this contract existed. And so, and the government says, oh, that's just speculation. What if the retrocession is not even known to primary insurers? No, no, I'm saying that when, if you're, if all state has a policy with you, all state reinsures Valis. Valis reinsures itself with petrol. All state may not even know about that. So how's the United States government going to find out about it? Well, it's a question of administration. The tax is imposed on, if it applies, on the reinsurer. It's the reinsurer's obligation to pay the tax. If it doesn't, it's in violation of the law. How does the United States government know about the existence of John Doe in California? Your Honor. Because he files a return. These concerns are the very concerns that the Fifth Circuit pointed to in the American bankers case. They say, oh, this is speculation. You say, well, that somebody would have had that duty to report. The Fifth Circuit said the problems of administering a tax in wholly foreign transactions would be so substantial that we cannot, we will not even give the word taxable its plain and ordinary meaning. And they also thought it would raise fundamental constitutional concerns, which we have also identified. On the leveling the playing field point, Your Honor, with respect to legislative history. The Fifth Circuit was very succinct. It was. That's a very short opinion. A very short opinion, Your Honor. They didn't decide. The leveling the playing field, it's simply not the case that applying the tax in this cascading fashion keeps the playing field level. If you look at page 44 of our brief, we explain the mechanics of this. The income tax is based on profits. The retrocession tax is based on, the federal excise tax is based on each time of a session of risk. And so it's cumulative. If you have $10 million of profit, as we explain in our example, that leads to $3.5 million of tax, divvied up among all of the U.S. reinsurers in their hypothetical. There is no accumulation of more tax, whereas if the policy is ultimately the first premium is $200 million, and it's a 1% tax, every single time you have another $2 million of tax. And that goes to their economic burden point. They say, well, the last person in the chain bears the economic burden. But under their theory, everybody in the chain is paying the tax. It's not a question of only the last person. Only if everybody in the chain is taking 100% of the risk. But no matter how much they take, Your Honor, they're taking a percentage. They have to pay the tax on whatever the premiums are for whatever percentage they take. And at the end, it should add up to the same. No, it won't, Your Honor. I encourage you to take a look. I'm not doing justice to the math here, but if you look at page 44, it's cumulative in the foreign cascading setting. It's not in the domestic setting. And if I could get to the presumption of extraterritoriality. Is that because, for example, as the Green Brief points out, they pay a local tax and they don't get credit? No, it has nothing to do with it.  It has to do with the fact that every single time there's a new reinsurance transaction, according to them, there's a new excise tax of 1% imposed. And it just keeps adding up. Whereas in the United States, it's based on overall profit derived from that first contract, and it doesn't get added up. The tax doesn't get added up. It gets divvied up. On the presumption against extraterritoriality, Your Honors, the government's simply wrong in claiming that that presumption is out of this case because the statute is only concerned with foreign entities. So it distinguishes Morrison by saying that, you know, the allusions to the Commerce Clause. This is a very different type of specific statement by Congress that this was going to apply. Right, Your Honor. But there are two problems with that argument. Morrison says, to the extent you find any extraterritorial scope clearly authorized, you have to limit it to that scope unless you find additional evidence for the expansion. That just takes us back to the beginning. But Morrison relies on Microsoft v. AT&T. And in that case, AT&T made the same argument, essentially. They said, this patent law that we're dealing with here was passed only to reach foreign conduct, so the presumption should just be kicked out of the case. It plays no role. And the Supreme Court said, no, no, no. It continues to operate to limit the scope of the extension into foreign affairs, and that's exactly the passage that the Supreme Court is relying on in the Morrison case. And it makes perfect sense. The scope here arguably would be limited by the fact that the tax would only apply to, quote, the U.S. risk that's covered. That's no limitation at all, Your Honor, because that's a cascading tax. I know. The point is, Congress clearly intended to capture first-level foreign reinsurance policies. We all agree on that. We think it's clear that's the only policies they meant to tax. But if there's any doubt about whether it goes beyond that, that's precisely when the presumption kicks in and says, we win. And even if you take their example, counsel alluded to the possibility of a foreign direct insurer and a first-level foreign reinsurer. And she said that shows that they wanted to reach transactions with two foreign entities. That's just a one-step first-level contract. What they're asking you to assume is that if this cascades seven times, that you can just keep applying the tax to every link in that chain. Well, I was going to ask you, your example on page 44 is exactly that. It's a hypothetical. And Judge Ginsburg asked counsel for the government, what's the normal situation? The norm, as I understand it, Your Honor. And counsel, I think, argued something like, well, there may be four links, but that's about it. We're not up to five or nine. Well, four links would consume way more of the profit than four domestic retrocessions, Your Honor. So the problem is still the same in terms of the economics. And on the question of deference, the government is asking you to defer to what their briefs say this regulation means. They never actually, the reason they didn't invoke it in the district court we submit is because no one read it to say that wholly foreign retrocessions are subject to the tax. And we have identified compelling evidence that no one, in fact, had that understanding, because it was issued in conjunction with a regulation that said the tax only attaches when you have a U.S. resident sending premiums out of the country. That never happens in a foreign reinsurance context. So a companion regulation completely refuted what the government now claims that other regulation means. And the IRS would have never written revenue rule in 2008 the way it did if it thought that that regulation applied tax to wholly foreign retrocessions. It said that the foreign retrocessions are taxable because the tax applies to contracts, reinsurance contracts, covering contracts taxable under Paragraphs 1, 2, or 3. The statute obviously doesn't say that. It doesn't say anything about or 3. The reason they had to insert those words was precisely because they understand that retrocessions only cover contract, only cover reinsurance contracts, which are only taxable under Paragraph 3. So that, those two examples show that what they now say is the meaning of the regulation is, in fact, not what anyone would have reasonably understood it to mean. And so it shouldn't get deference for that reason alone. But if you even clear that hurdle and the waiver problem, you still run into the problem of the presumption against extraterritoriality. At Chevron Step 1, you would have to apply that presumption to determine whether the statute had a plain meaning or was ambiguous, and you would have to resolve any ambiguity against their interpretation at Step 1 of Chevron. So you would never get to Step 2. And if you look at Justice Scalia's concurrence in the Aramco case, he comes out, he gets to the same result a different way. He says any time a regulation affords a statute extraterritorial scope that isn't clearly provided for in the statute, it's unreasonable. So either they never get to Step 2 or they always lose at Step 2, but there is no deference owed. And another reason, Your Honor, to go back, Judge Rogers, to your earliest question, their statute renders the phrase covering any contract meaningless. They say the tax is coterminous with the definition of reinsurance. If that were true, the statute would say 1% tax on a policy of reinsurance, full stop. The statute goes on for 11 more words to say covering any of the contracts taxable under Paragraphs 1 or 2, and they give no meaning to that. They now say that our interpretation renders the reinsurance definition meaningless. That's not true. I understand counsel want to talk in extremes here, but I don't think that's what the government is arguing. They acknowledge the limit in 1 and 2. All right. So moving from that limit, the question is, does the excise tax reach these other links? So they acknowledge the limit of 1 and 2. But the question, Your Honor, is the limit of covering any contracts in Paragraph 3. They're saying that – But you said they're ignoring 1 and 2. No, they're ignoring the entire phrase. The entire phrase says the tax is imposed on one reinsurance policy that covers primary insurance policies. And, in fact, that's what it says. No, I understand. You're saying contract is not the same as risk. Correct. All right. And they've given no independent meaning to that clause. And, instead, they say, well, it doesn't make any sense for Congress to write a broad definition if it's not going to tax everything in that definition. Yeah. What rule is there that says that Congress can't write a statute that way? Congress did exactly that in Paragraph 1 with casualty insurance. That's why I asked whether in the tax code isn't there a lot of repetition. Your Honor, they haven't made that argument, and I don't think it's fair to say – I mean, it's a cardinal rule. Both of you are arguing the other side's interpretation results in surplus. But they haven't demonstrated that that's true in our case. I was trying to explain, Your Honor, that if they're right, then that's exactly what Paragraph 1 does. Paragraph 1 says foreign casualty insurance or casualty insurance, everything that isn't life insurance. The opening clause says tax imposed on every policy of insurance issued by a foreign insurer. If you stop reading there, that means the United States purports to tax every foreign casualty policy in the world. That's insane. Then Congress goes on to Paragraph 1 and says, if issued in the name of an insurer, that obviously drastically narrows the definition of casualty insurance. And on their view, that can't be right because that would render the definition surplusage. That's not – it just makes no sense. And there's very compelling reasons for why Congress wouldn't want the scope that they have suggested. You read the brief of Aramiki. They explain the burdens and difficulties that would arise from imposing the tax in this cascading fashion. It would raise significant comedy concerns. And as I said earlier, Your Honor, the government, the Fifth Circuit, recognized that the sweeping scope they purport to give the statute would result in enormous difficulties of administration and enforcement. On the avoidance point, they say, well, you can create – they sort of speculate about the kinds of structures that would be created and the tax consequences of those structures. We pointed out in our brief that the United States has tools to prevent tax avoidance, basically relying on sham transactions just to avoid tax. But even if you could posit that, maybe some people will be able to reduce their tax burdens. I mean, I've never heard that structuring transactions in order to minimize taxes is an absurdity under the U.S. laws. I mean, I think that's part of the business world's mindset. And an absurdity means that the line Congress drew is irrational. And here the line Congress drew is totally rational because Congress didn't want a tax that raises constitutional concerns, that would raise comedy concerns, that would entail significant problems of administration and enforcement. And the last point I'd like to make, Your Honors, is they have no explanation for why over a dozen treaties have anti-conduit provisions if the tax, in fact, cascades as the way they claim. As we've explained, those treaties say you issue a policy to a company in Treaty Nation A, we'll waive the tax. But if that company turns around and reinsures it with a company in Country B that doesn't have the tax protection, the treaty, we're going to reimpose the tax on that first transaction. Why? The whole point of the anti-conduit provision is because otherwise the tax would be completely evaded. But on their theory, it wouldn't ever be completely evaded. It would just apply at the next leg. They wrote three pages in their reply brief on this point. And with all due respect, I do not understand what competing explanation they have put forward for those treaty provisions. We think they're just one of the many pieces of evidence that demonstrate that Congress never intended to tax wholly foreign retrocessions such as the ones that are issued here. So at the first level, you concede the tax applies. Yes, Your Honor. We've paid that tax. I just want to be clear. I understand you paid it, but you're seeking a refund, too, as to the link. No, no. As to the second level. Correct. No, but what I'm saying is on the first level, when all state, we paid that tax, and we've never disputed that tax. And we think that tax is constitutional because in that sale, the ballast is benefiting from a market the United States has made available. Then we turn around and we buy protection for ourselves, which is an asset for our business, from Petrel, a Bermuda company. In that circumstance, we're not availing ourselves of any benefit that the United States has made for us. Well, you heard the question I asked counsel based on the statement in the opening brief. Do you remember that question? I'm sorry, I don't, Your Honor. Well, it was that, you know, the intent of Congress would be afforded if it excludes all retrocessions or at least rooms for foreign insurers and reinsurers to structure their transactions in a way to allow them access to the U.S. insurance market and yet avoid the tax imposed by 4371. And you heard what counsel responded, namely with the affiliates, et cetera, and you could structure the arrangements so that you'd end up paying no tax. What's your response? Your Honor, my response is the one I gave a moment ago, which is that the United States government has tools available to prevent transactions that have no business purpose other than to evade U.S. taxes. But that, the argument that you could. This was not her. As I understood counsel's response, it was not that anybody was unlawfully evading taxes. It was just that they were structuring their business arrangements so that they paid little, if any, tax. But, Your Honor, if there's no business purpose other than the purpose of what you just described, then that is when the United States has tools to step in. But the more fundamental. It's not a sham transaction. The risk is actually transferred to the foreign affiliate. But it's not done for any purpose other than to evade the tax. That's the test of sham. No, suppose it's not a subsidiary. There's some percentage ownership so that the reason for transferring the, selling the risk to the affiliate in Europe is to adjust the actual allocation of risk. They retain 10 percent or so. Your Honor, my understanding is that there was, I confess, I don't know the ins and outs of the affiliate structures, but I think if the only purpose for doing that is to evade the tax, then that's, the government can respond to that. They can also issue regulations to address, even if it's not a sham, they can issue regulations to address this problem. But the more fundamental point, Your Honor, is I don't think you can interpret this statute. You can't say there's a plain meaning, but we're going to decide to let them ignore the plain meaning to give a statute sweeping extraterritorial scope in order to address possible problems with, I mean, the real answer to that is Congress can do something about that. It can't be the answer isn't, oh, we're going to contort the language of the statute and give it extraordinary extraterritorial scope because that's not an absurdity. The only reason you can say we're not going to enforce this statute in accordance with the plain language is because it would lead to an absurd result. And the reason Congress drew the line here is perfectly rational for the reasons I previously gave. If the Court has no other questions. All right. Thank you. Thank you, Your Honor. All right. Counsel for Appellant. Thank you, Your Honor. I don't think you need to contort the statutory language here to get to the result the government is urging. I think the ordinary meaning of covering certainly contemplates the situation where there's a chain of responsibility that ultimately gets paid by someone else or in part by someone else. And I think if you just think about the situation where, you know, like if I go on government travel and I charge money to my credit cards, the credit card has to pay the hotel and then the government ultimately pays the credit card company. And you think of the government as covering the charge for my business travel, but there's never any contract between the hotel and the government. So I think, you know, if you take other ordinary examples, that fits with the ordinary usage of covering. There is a difference between covering risk, right, and covering contract. Well, I think as the American Bankers Court explained, what Congress clearly intended in the original statute was to cover risk. That's what they spelled out. And then Congress, again, specifically said they didn't mean to change the meaning when they reorganized. And I think you can read covering contracts as covering the risk associated with them. Well, when you say this is what Congress intended in the original statute, are you saying that if Congress says that's what it's doing, but the words of the statute actually do something else, we ignore the words of the statute and look to the legislative history? Well, I'm saying the original words of the statute would have reached the risks. And then Congress said we don't mean to change the meaning. There's a reading of covering that is consistent with the original meaning. And it makes sense to adopt that meaning. I would just also emphasize that while these contracts are indemnification contracts, reinsurance contracts could take different forms. There could be an assumption contract where the reinsurer assumes risks and lets the original insurer off the hook. There could be any variety of contracts. And so they're focusing on the particular contracts that are at issue here, which are indemnification contracts. But I'm not sure that you necessarily have to look that narrowly. And I think that, as Judge Rogers pointed out, that Congress, when they're rewriting the statute and trying to just reorganize and make it more readable, which is what the legislative history indicates they were trying to do, would have looked at what was sort of the normal meaning of covering, and they would have thought covering the risks associated with that contract fell within the language covering the contracts. And so I think that that meaning is the most reasonable reading of the statute, and it is one that comports with the case law and the regulations and the history of the statute. Counsel, if the distinction between assuming the risk and indemnification is helpful to your argument, then develop it, because I'm not sure. Well, I think, you know, depending on what the reinsurance contract says, which is something that's up to the reinsurers, there could be different arrangements between two reinsurers. It might be one of indemnification. You know, my understanding is. So what is the difference in that between assuming the risk and indemnification? Well, if there was an assumption of the risk and an innovation that freed the original insurer of liability, then the reinsurer would be ultimately on the hook for the contract. And I think. And would that mean that the insured would have a right of action against the reinsurer? That is my understanding. I don't claim to be an insurance expert, but that's my understanding. And, in fact, the Northumberland case talks about and refers to the treatises which talk about different types of reinsurance. So I think, you know, that Valis' approach is really narrowing this to the contracts that are an issue here, and we need the courts to think about the issue of whether there could be different structures to reinsurance contracts. Is that in your brief? I don't believe that is in my brief, Your Honor. That's actually something that came to mind more recently rereading Northumberland. But I think it's important to think about that, you know, there could be different types of contracts. And even if it is, you know, even if you were to conclude it's limited to reinsurance, I think the reading of covering reasonably contemplates assuming that the loss is associated. When you look at these contracts, all the underlying risks are what trigger the obligation to pay under the contract. So I think that's a reasonable reading of covering. And just touching briefly on the issue of where the extraterritorial presumption falls with respect to Chevron deference, I think both that's a rule of construction that would be applied with the statute, but I think certainly given the history, it's a reasonable reading to adopt the approach in the regulation. So the court doesn't have to get to using a rule of construction to resolve it, because we've got a reasonable reading in light of the history, and there are a lot of other rules of construction that I've discussed, like looking at the statute as a whole and not disregarding the definition of policy of reinsurance, that would counsel in favor of reading the statute consistently with the regulation. And I also just would point out that I think the idea that Chevron deference doesn't play a role when the extraterritorial presumption is involved is not clear. I mean, I think in Morrison and the Arabian oil case both that Chevron arguments were raised and the court didn't adopt them because it concluded the particular ruling at issue wasn't entitled to deference, and it didn't say Chevron deference can never apply in this context. So I think the court has perhaps left that open, but I think here, for the reasons, the court doesn't have to get to that because this is clearly a statute that was intended to have foreign application, and I think it's reasonably read consistently with the regulation here. Can you tell me, given your interpretation of the statute, what is your response to counsel's pointing out these anti-conduit provisions in the treaties? Your Honor, I really view that as a red herring. The treaties are negotiated with treaty partners and provide for exemptions from certain tax. And basically, as we lay out in the brief, what the State, you know, what the Treasury Department does in negotiating these treaties is a very general matter, is to try to look at, you know, do we have tax partners who have similar tax schemes where things would be taxed twice because, for example, we have an income tax and the foreign country has an income tax that's comparable. And those exemptions are intended to provide exemptions for treaty partners that have a comparable income tax where there wasn't the same issue of a competitive advantage because the foreign insurer would pay no income tax. And the different wording of the different treaties is a product of negotiation, and I think if the tax generally applies to each level of restitution, it makes sense that there would be negotiations regarding, well, if at a certain point the tax gets passed beyond the treaty partner, then should the tax apply just to the next step in the chain, or should the treaty partner lose their exemption? And I think that's the subject of negotiations that really aren't part of the statute, that might have to do with things totally unrelated to the statute. So I think those, the balance is reading weight. They reflect the government's understanding of the statute. Well, I think, and I don't think there's anything in the discussion of the treaties in Revenue Ruling 2008-15, which I think is what they're relying on, that is inconsistent with our construction of the statute. I mean, it just explains, you know, how different treaty provisions are interpreted, and it all rests on the fundamental conclusion, consistent with the Treasury regulation that it relies on, 4371-2C, that each retrocession would be taxed but for some treaty provision to the contrary. And I think that's wholly consistent with our position here, and to the extent that there's some exception to that based on what's in the treaties doesn't indicate a different interpretation should be adopted. So I don't think the treaties really add anything to the analysis here, and it's certainly not inconsistent with our position. All right. Thank you. We'll take the case under advisement. We'll take a short recess.
judges: Rogers, Brown, Ginsburg